## HERMAN MARX V. THE STATE.

No. 21480.    Delivered May 14, 1941.

The opinion states the case.

*Joe Burkett* and *O. Shelly Evans*, both of San Antonio, *C. F. Richter*, of Devine, and *Chas. Bates, Jr.*, of Cotulla, for appellant.

*Spurgeon E. Bell*, State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was charged by indictment with murder with malice, and was by the jury convicted and sentenced to serve five years in the penitentiary.

The State's testimony as to the facts occurring at the scene of the killing is shown by the witness Hoge Poole, son of the sheriff of La Salle County. It seems that Poole and appellant had had some differences based upon the cattle of Poole coming into a field owned or rented by appellant, and it seems that appellant had driven some cattle of Poole's out of this pasture across a fence into another pasture belonging to or leased by Poole, and it was claimed by Poole that he and his companion, Marcelius Talbott, had gone down to the Marx home at 10 o'clock at night to tell Marx that he, Poole, had this pasture leased, and for Marx not to drive his, Poole's, cattle out of this pasture any more. We quote the beginning portion of his testimony, when he began to tell of what happened that night of July 21, 1940:

"I was going north from Cotulla and I stopped at the house of the defendant, Herman Marx, and I went in to see him and called him and he came to the door and I told him that I had this land leased that belongs to Mrs. Badour and I did not want him running my cattle out of my pasture, as he had done previously, and his wife came to the door with him, and she said something to him and he said something I could not understand, then an instant later he left the door and I was standing in front of the door—and then an instant later he started shooting—he shot one shot and I leaned against the house. Marcellus was standing by the car and when he shot I hollered 'Watch out' and then he shot again and Marcellus fell and I picked him up and brought him to Doctor Lightsey here in Cotulla, Texas. Doctor Lightsey and I then took him to Pearsall to the hospital."

At the Pearsall hospital a transfusion of blood was given

Mr. Talbott, but he soon died, the wound in his leg being so severe that it evidently severed some arteries, and the doctor said his death was caused either from shock and loss of blood or an embolism, it was difficult to tell which.

On cross-examination the witness Poole said:

"In response to the question that all that happened when I went to the door that night was that I called Mr. and Mrs. Marx and wanted them to know that the Badour pasture was leased by me and I did not want him to let the fence down and such like, will say that I told him not to run my cattle out and I went to inform him that I had that land under lease. He had run my cattle out of the pasture into my next adjoining pasture. Then he went back into the room and came back shooting. * * *

"At the time we arrived at the Marx residence the house was dark but I called and said: 'Mr. Marx this is Hoge Poole. I have come to see you on business.' He and Mrs. Marx came to the door together. I couldn't see if he was in his night-clothes or not. The moon was shining but it didn't shine in the house enough to discern whether he was in his night-clothes or not. I don't think the moon was shining full force upon the door."

It seems that the point of the shooting was five or six miles away from Cotulla, and no effort was made to staunch the flow of blood from Mr. Talbott's leg until he and Poole reached Cotulla, at which time Dr. Lightsey corded the leg and then carried Mr. Talbott to Pearsall, arriving there about 11:45 o'clock at night, at which time the injured man was in a profound shock. The testimony showed that the doctors at Pearsall were unable to operate on the injured man, but merely attempted a blood transfusion.

Appellant's witnesses gave an entirely different version of the trouble at his home the night of the tragedy. It was claimed that appellant and his wife were in bed in their home, which was very close to the highway in the town of Gardendale, their home seeming to be an old filling station. That Mr. Poole and his companion came up and stopped their car close to his home, at 10 o'clock at night, and demanded that appellant come out of the house, that they wanted to talk to him. This appellant refused to do; that they cursed him and threatened to kill him, and refused to leave the premises, evidencing some show of violence, it being claimed by appellant's fifty-two year old wife that, standing in the door of the home, she was severely

struck by these men in the abdomen; that they continued to curse and threaten appellant, demanding that he come outside, and "they would kill the German son-of-a-bitch;" that while appellant's wife was screaming, appellant got his rifle and shot twice through the window screen and one bullet struck Mr. Talbott in the leg; that Mr. Poole then took Mr. Talbott in his car and left. It was appellant's witness' testimony that one of these men had a knife in his hand while demanding admittance into the Marx home.

Appellant filed a motion for a change of venue, which was controverted by an affidavit of T. H. Poole, the sheriff of that county, and evidently some testimony was heard thereon, but same is not found in the record, and we can not pass upon the ruling of the court denying such change without such testimony. In the event of another trial hereof the trial court may find it expedient to change such venue on his own motion.

There are many bills relative to the formation of the jury, and the method in which such names were placed on the venire list, and on the list served on appellant as well as called in the trial. Such will doubtless not again arise in the event of another trial. This will dispose of all bills until we reach bill No. 8, which relates to a question propounded to appellant's witness, Henry Bube, wherein he was asked if a warrant of arrest had not been issued for him out of Seguin for swindling. We do not think such to be a proper question. We think the proper question should have been an inquiry as to whether or not such witness had been indicted, or a complaint had been filed against him for such offense.

Bill of exceptions No. 9 relates to a question propounded to appellant's wife relative to the place of her birth, it being shown that she was born in Germany, and many other complained of questions, which it was contended was a cross-examination of the appellant's wife on matters not brought out on her direct examination by appellant's counsel. We think the major portion of the cross-examination pertinent. We do not think the place of her birth was pertinent, and same should not have been gone into by the State from the witness.

We find in the record another bill of exceptions also numbered nine, which complains that during the cross-examination of appellant's wife she was asked if she had not told the deputy sheriff after the killing that she had said to her husband, "Don't shoot, Herman, don't shoot, but he shot anyway." Mrs. Marx denied making such a statement to her husband, and also denied

that she so told the deputy sheriff. The question was objected to by appellant upon the ground that in the direct examination of appellant's wife no such conversation had been inquired about. The correct rule in regard to such inquiry is stated, we think, in Hicks v. State, 97 Texas Cr. R. 373, 261 S. W. 579, to the effect that if the impeaching evidence was germane to what she had testified in appellant's behalf on direct examination it would be proper for the State to impeach her thereon. It is not required that the exact matter should be gone into by appellant on his examination of the wife. We do not discuss the matter further, but only advert to the rule in order that it may be had in mind in the event of another trial.

We find bills of exceptions Nos. 12, 13, 14, 15 and 16 all in the same condition and all based upon the same proposition, and all will be treated together. They refer to a failure of the court to instruct the jury that certain testimony of witnesses who testified that appellant's general reputation for being a peaceable and law-abiding person was bad in the community where he resided, was admitted solely for the purpose of aiding the jury, if it did so, in passing upon appellant's request for a suspended sentence. Unfortunately for the appellant, we do not find in the record any objections to the court's charge presented and filed before such charge was read to the jury as is contemplated by the statute. True, we do find such objection in these bills of exception, but they were filed on December 26, 1940, while the trial was had on September 23, 1940, and the motion for a new trial was overruled on October 1, 1940. These objections to the court's charge filed at such a date can not be considered by us. To so consider them would be to destroy one of the reasons for the rule, and that is to give the trial court an opportunity to correct an erroneous charge. See Art. 658, C. C. P.

Bills of exception Nos. 17 and 18 relate to the argument of the special prosecutor and can both be treated together. The remarks complained of are as follows:

"Gentlemen of the Jury, we have this man of Germany—this man or beast, or whatever you want to call him, who has murdered a fine young citizen of your county, Marcellus Talbott; the life of one of our popular citizens has been snuffed out by this murderer, and he should be given the same punishment he meted out to Marcellus Talbott, * * * This man or beast murdered Marcellus Talbott."

Also we quote from bill No. 18:

"The whole secret is this: they had been having trouble with

this man or beast, whatever you want to call him, and he murdered the deceased because of his ill-will against him."

It will be observed that the record shows that both appellant and his wife were born in Germany, and that they had lived in this country but a few years, and only three years in the little filling station where this tragedy occurred. According to appellant's witnesses, these two men at the scene of the killing had refused to leave his home, and the deceased had said "he was not going to leave until he killed the old German son-of-a-bitch," while Poole said "I am leaving and I will be back in the morning," and the other one said he was not going to leave until "I kill the old son-of-a-bitch." It was also shown by appellant's witness that they told the wife "We should get out and get back to Germany inside of four days, or else they would kill us." It is also shown in the record by appellant's son, Albert, that on the night of the killing the following occurred:

"The night I went to Cotulla I went in there to get some oil for the tractor. On my way home I stopped at the Kentucky Tavern to get some cigars to take home with me. When I went into the Kentucky Tavern a man came jumping up and asked me why I didn't go over to Germany and help Hitler with the war. I don't know what made him say that. His name was Carl Ballard. He wanted to start a fight then and a man by the name of Frank Norman came out and stopped it all. When he came and asked me why I didn't go over to Germany and help Hitler with the war he cursed me and called me a German son-of-a-bitch, and all kinds of other names with it. I then got in my truck and drove off. I never had been in there before; and that man had never cursed me before and he cursed me for no reason at all that evening."

It is evident as a matter of common knowledge that about the time of this trial and thereafter up to this writing this democratic form of government has awakened to what is considered an emergency arising from the attacks of the German people upon what is considered in this country to be as nearly an ideal form of government as has ever been conceived by the mind of man, and that such German government is making a concerted effort to destroy such government throughout the earth; that their leader, Hitler, and those people who thus blindly follow him are execrated by the American people and held in contempt by all right thinking American citizens; that the word German citizen or sympathizer when applied to any person in these United States is a derisive epithet and calculated

to inflame the minds of American citizens, carrying with it the obloquy and inference of one who would destroy our form of government, and make us subservient to a totalitarian state, in direct opposition to the known and cherished forms of a free democracy.

We think these remarks constituted error, that they were inflammatory and were calculated at such time to unfairly influence the jury against the appellant.

We also think the calling of appellant "a beast" was untimely and unwarranted. There seems to be naught shown in this record of a bestial aspect. We find him and his wife in bed in an old filling station, his home, and the improbable story of two men driving up at 10 o'clock at night, within a few feet of his door, and demanding that he come out and talk to them at this hour; then two shots being fired from inside this home, and unfortunately one of them resulting fatally to Mr. Talbott. No further shots were fired and nothing said according to the State's testimony.

We are unable to find anything in the record that called for this abuse of appellant, and we think such remarks should not have been engaged in.

We note that the first above quoted remarks, when objected to by counsel, called forth from the court the statement that such remarks were not proper, but he failed to instruct the jury not to consider the same; and in the last above quoted remarks, being in part a repetition of the first quoted remarks of special counsel, the court made no ruling, save to overrule appellant's objection thereto.

Personal abuse is not argument and should not be indulged in by counsel, and taking into consideration all the surrounding circumstances shown in this case, we think the above complained of remarks were so prejudicial to the rights of appellant that they call for a reversal of this cause. We cannot tell whether they affected the verdict or not, the verdict being "as charged in the indictment" only, not specifying whether with or without malice, and assessing a penalty of five years. Under this verdict we can not tell whether the punishment is assessed for murder with or without malice.

In any event, we think there are sufficient errors evidenced by the record to indicate that appellant has not had a legal trial under the law, and the judgment is therefore reversed and the cause remanded.