

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00015-CR

_____

STANLEY REX BAUGUS, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1711978R

_____

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury convicted Appellant Stanley Rex Baugus of two counts of sexual assault. *See* Tex. Penal Code Ann. § 22.011(a)(1). The jury assessed his punishment on each count at ten years' and one day's confinement, and the trial court sentenced him accordingly with the sentences to run concurrently. In four points on appeal, Baugus complains that the evidence is insufficient to support his convictions, that the State engaged in improper jury argument, that the trial court abused its discretion by admitting certain testimony over his hearsay and relevancy objections, and that the trial court abused its discretion by denying his motion for new trial that was based on his assertion of ineffective assistance of counsel. We will hold that the evidence is sufficient to support Baugus's convictions, that he has waived his complaints relating to improper jury argument, that he has waived one of his complaints relating to the trial court's admission of testimony and not demonstrated any harm caused by the trial court's admission of the other complained-of testimony, and that the trial court did not abuse its discretion by denying his motion for new trial. We will thus affirm.

## II. BACKGROUND

### A. Baugus Meets Sally in the Summer of 2017

In the summer of 2017, S.H. (Sally[1])—the complainant in this case—was living with her grandmother in Fort Worth.[2]  Their next-door neighbor, Ronald Bruce Dyer, Jr., was good friends with Baugus, and Baugus spent a lot of time at Dyer's house.[3] Sally met Baugus that summer while he was in the neighborhood.  Over the course of that summer, Sally "hung out" with Baugus and Dyer on several occasions at Dyer's house where the three of them would smoke marijuana and drink alcohol.  Sally indicated that she was aware that Baugus was romantically interested in her.[4]

### B. Sally's Description of the Events of August 13–15, 2017

At Baugus's trial, Sally testified regarding certain events that took place on August 13–15, 2017.  Sally's description of these events is set forth below.

On August 13, Baugus was housesitting for Dyer while Dyer was out of town. Sally had planned to smoke marijuana that day with some of her friends, but her friends had "bailed," so she decided to go over to Dyer's house and smoke marijuana

---

[1]To protect the complainant's anonymity, we use an alias to refer to her.  *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2]Sally was twenty-one years old at the time.  Sally's grandmother had raised her since she was three months old.

[3]Baugus was twenty-eight years old and married at the time.

[4]According to Sally, she was not aware that Baugus was married.

3

with Baugus.[5]  Before she went to Dyer's house, Sally spoke with Baugus on the phone, and he mentioned that he had obtained Smirnoff Ice to drink.  According to Sally, Baugus was "pitching [the Smirnoff Ice] like he was a car salesman."  When she arrived at Dyer's house, she sat on the couch, and "there was an open Smirnoff Ice sour apple sitting on a table next to [her.]"  Baugus was "very pushy" about having her drink it.  That raised a "warning flag[]" for Sally, and she declined the drink.  Baugus's cousin—Curtis Baugus—later arrived at Dyer's house, and Baugus and Curtis recommended that Sally swim in Dyer's pool.  When Sally expressed that she did not have a bathing suit with her, Baugus told her that she could get into the pool naked.  Sally then left Dyer's house because she thought that Baugus's suggestion to swim naked was "disgusting."

The next day—August 14—Sally started questioning her judgment about the prior day.  She reached out to Baugus in the afternoon to let him know that she wanted to swim in Dyer's pool.  Baugus told her to come over, and Sally walked to Dyer's house sometime after 4:00 p.m.  When she arrived, she and Baugus ate food and smoked marijuana together.  Sally then went outside and got into the pool.  Shortly after Sally got into the pool, Curtis arrived at Dyer's house.

Sally and Baugus then began drinking alcohol.  According to Sally, Baugus brought her all of her drinks.  The first drink Baugus gave her was a closed Smirnoff

---

[5]Sally stated that her sister had died in April 2017 and that she smoked marijuana in the summer of 2017 to cope with her sister's death.

4

Ice, which she drank. The second drink Baugus gave her was an opened Smirnoff Ice that had a "haze in it." Sally declined the second drink and told Baugus to bring her a different one. Baugus then brought her a closed drink, and Sally drank it. Baugus later brought Sally an opened Bud Light, and Sally drank half of it. Within "a couple of minutes" of drinking it, Sally recalled Curtis asking whether they needed "to get the floaty to get her out" of the pool, and she then "blacked out."

The next thing Sally remembered was waking up in bed with Baugus on top of her. She was unsure how she had gotten out of the pool and into the house. She could feel Baugus's penis "just, like, basically flop on [her] vagina," and she said "no" three times and tried to move her arms to push Baugus off of her, but she was unable to move her arms.[6] In response, Baugus said, "[L]et me just rub it." Sally then blacked out again.[7] She later woke up naked in bed with Baugus asleep naked next to her, found her belongings "neatly placed" in the kitchen, grabbed them, and left Dyer's house.

Soon after arriving back at her house—by this time, it was the early morning hours of August 15—Sally texted Baugus about what had occurred. In those texts, Sally told Baugus that she "remember[ed] saying no repeatedly and [he] ignored [her]." Baugus indicated that they "didn't do anything," and Sally told him, "You can't tell me

---

[6]Sally testified that she did not actively participate in any sexual contact with Baugus.

[7]Sally estimated that the period between blackouts was "[t]hree minutes at the most."

you 'didn't do anything' because I have a brain and a memory. I woke up to you trying to have sex with me and you kept going as I PUSHED AND SAID NO." When Baugus sent her a message promising that they "didn't have sex," Sally responded, "You can't promise me s[***.] I remember."

After exchanging text messages with Baugus, Sally went to sleep and woke up around 9:00 a.m. She then contacted the police.

## C. Baugus's Description of the Events of August 13–15, 2017

Detective Stephen Hennard of the Fort Worth Police Department was assigned to investigate the alleged sexual assault. As part of his investigation, Detective Hennard interviewed Baugus on August 25, 2017, and September 5, 2017, regarding the events that took place on August 13–15. Baugus's description of these events is set forth below.

On August 13—the day before the alleged assault—Baugus was housesitting for Dyer. Sally came over to Dyer's house that night, she and Baugus watched a movie together, and they "snuggled on the couch."[8] The next day, Sally sent Baugus a text message asking if she could come over to Dyer's house to swim.

That day, Sally went over to Dyer's house, and she and Baugus drank beer. According to Baugus, both he and Curtis—who was also present at Dyer's house on August 14—took turns getting the beers. Baugus denied putting any substance in any

_____

[8]Baugus stated that the "snuggling" consisted of him laying his head on Sally's lap while she rubbed his head and his arm.

6

alcoholic beverage that he served to Sally. Baugus indicated that Sally was "killing the Smirnoff" and estimated that she drank twelve Smirnoff Ices and "a bunch" of Bud Lights. He estimated that he drank no more than twelve Bud Lights. Baugus indicated that he and Sally had kissed while in the pool on August 14.

Toward the end of that night, Sally got out of the pool and asked Curtis where she could take a shower, and Curtis directed her to the master bedroom. Approximately fifteen minutes later, Baugus went to check on Sally and found her lying in the bathtub asleep, with the water close to her face.[9] Baugus then drained the water and assisted her in getting out of the bathtub. When Sally got out, she wanted to start drinking again, so she and Baugus started drinking more beers, and they also smoked marijuana.

They then went to the master bedroom where they began "making out [and] feeling on each other." Baugus described "fingering" Sally, "rubbing her clit," and trying to give her the "shocker."[10] Baugus indicated that these acts were "very consensual" and that Sally was awake "100%" during the encounter "without a doubt." Baugus then attempted to initiate sexual intercourse with Sally, and she said,

---

[9]According to Baugus, Curtis left Dyer's home shortly after Baugus went to check on Sally in the bathtub.

[10]At trial, Detective Hennard describe the "shocker" as penetrating the vagina and anus with one's fingers at the same time.

7

"No." Baugus and Sally then both turned over and went to sleep.[11] When Baugus woke up, Sally was gone.

## D. The SANE Exam and the Toxicology Report

After speaking with police on August 15, Sally was taken to the hospital where a sexual assault exam was performed on her by Cindy Romaguera, a sexual assault nurse examiner (SANE). At Baugus's trial, Romaguera testified that Sally had described the assault as Baugus "trying to put his penis in [Sally's] butt." Romaguera stated that Sally was unsure whether Baugus's penis had touched Sally's vagina and that Sally had indicated that Baugus's "finger/hand" had not made contact with her vagina. Romaguera stated, however, that Sally had indicated that Baugus's penis had made contact with Sally's anus, as had his "finger/hand." Sally also complained to Romaguera that her anus was sore. During the exam, Romaguera found "a small amount of dried blood around [Sally's] anus," although Romaguera indicated that the blood could have been menstrual blood given that Sally was on her period at the time of the assault. Romaguera did not see any tears or injuries to Sally's anus, nor did she see any signs of trauma to Sally's body.

Because Sally had lost consciousness, Romaguera took blood and urine samples from her on August 15. The testing from Sally's urine revealed the presence of

---

[11]Baugus told Detective Hennard that his penis never touched Sally.

benzodiazepines. Sally denied ever having taken benzodiazepines. Baugus stated that he had taken a quarter of an anti-anxiety pill on the morning of August 14.[12]

## E. Procedural History

Baugus was indicted for two counts of sexual assault—one count alleging that he had intentionally or knowingly caused the penetration of Sally's sexual organ by inserting his finger into it without her consent, and the other alleging that he had intentionally or knowingly caused Sally's sexual organ to contact his sexual organ without her consent.

The case proceeded to a jury trial in January 2022. Several witnesses— including Sally, Sally's grandmother, Detective Hennard, the SANE nurse, and a toxicologist—testified during the guilt–innocence phase of Baugus's trial. The jury returned a verdict convicting Baugus of two counts of sexual assault. After hearing testimony from several defense witnesses during the punishment phase, the jury sentenced Baugus to ten years' and one day's confinement on each count, with the sentences to run concurrently, and the trial court sentenced him accordingly.

Baugus later filed a "Motion for New Trial and Motion in Arrest of Judgment" (motion for new trial), arguing that he should be granted a new trial because he received ineffective assistance of counsel. Baugus later requested that the trial court

---

[12]It is unclear what type of anti-anxiety pill Baugus took. At one point in his testimony, Detective Hennard indicated that the anti-anxiety pill was a benzodiazepine, although he later clarified that he did not know whether the pill was a benzodiazepine.

allow him to depose his trial counsel, and the trial court granted that request. Following a hearing on Baugus's motion for new trial, the trial court signed an order denying the motion. This appeal followed.

## III. DISCUSSION

### A. Baugus's Sufficiency Complaint

In his first point, Baugus argues that the evidence is insufficient to support his convictions.

#### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative

10

force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021).

### 2. Elements of the Offense

A person commits the offense of sexual assault if he intentionally or knowingly causes the penetration of the sexual organ of another person by any means, without that person's consent, or if he intentionally or knowingly causes the sexual organ of

11

another person, without that person's consent, to contact or penetrate the sexual organ of another person, including the actor. Tex. Penal Code Ann. § 22.011(a)(1)(A), (C). The Penal Code sets forth several circumstances in which a sexual act is considered to be without a person's consent. *See id.* § 22.011(b)(1)–(14). As relevant here, "[a] sexual assault under Subsection (a)(1) is without the consent of the other person" if "the other person has not consented and the actor knows the other person is unconscious or physically unable to resist" or "the actor has intentionally impaired the other person's power to appraise or control the other person's conduct by administering any substance without the other person's knowledge."[13]    *Id.* § 22.011(b)(3), (6).

### 3. The Evidence is Sufficient to Support Baugus's Convictions

Baugus claims that the evidence is insufficient to support his convictions. We disagree. Here, Sally described contact between her sexual organ and Baugus's sexual organ, mentioning that she had woken up from a blacked-out state with Baugus on top of her and that she could feel his penis "just, like, basically flop on [her] vagina." During his interview with Detective Hennard, Baugus admitted to acts that would support a finding of penetration of Sally's sexual organ with his finger, stating that he had "finger[ed]" her and that he had also attempted to give her the "shocker" but that she had not enjoyed the "shocker."

---

[13]The jury was charged on both of these statutory provisions.

12

As to consent, Sally testified that Baugus brought her all of the alcoholic beverages she drank on August 14, one of which was opened and had "a haze in it" (which she declined), and another that was opened (which she drank). Baugus estimated that Sally drank at least twelve Smirnoff Ices, an amount that a toxicologist testified could reasonably have caused her to pass out. Sally testified that, after drinking the opened beer, she blacked out and woke up with Baugus on top of her. She said that she stated "no" three times and tried to move Baugus off her, and after Baugus said, "[L]et me just rub it," she blacked out again. Sally testified that she did not actively participate in any sexual contact with Baugus. "A victim's testimony is sufficient, in and of itself, to provide sufficient evidence to support a conviction." *Babineaux v. State*, No. 02-21-00085-CR, 2023 WL 164089, at *2 (Tex. App.—Fort Worth Jan. 12, 2023, no pet.) (mem. op., not designated for publication) (citing *Marshall v. State*, 479 S.W.3d 840, 845 (Tex. Crim. App. 2016)).

Moreover, a rational factfinder could have found that Baugus provided Sally with a substance containing the benzodiazepine found in her urine. In this regard, Sally denied ever having taken benzodiazepine, while Baugus stated that he had taken a quarter of an anti-anxiety pill on the morning of August 14. *See Powell v. State*, No. 02-19-00206-CR, 2021 WL 5370163, at *5 n.15 (Tex. App.—Fort Worth Nov. 18, 2021, pet. ref'd) (op. on reh'g) (mem. op., not designated for publication) ("Benzodiazepine is a central nervous system depressant prescribed for anxiety."). Given that Sally testified that Baugus had provided her with all of her drinks on the

13

day of the assault, that she had denied ever taking benzodiazepine, that Baugus had taken a portion of an anti-anxiety pill on the morning of the assault, and that Baugus had been "pushy" about having Sally drink opened drinks, a rational factfinder could have found that Baugus intentionally provided Sally with a substance containing benzodiazepine without her knowledge that impaired her power to appraise or control her conduct. *See* Tex. Penal Code Ann. § 22.011(b)(6); *Braughton*, 569 S.W.3d at 608.

Baugus argues that the evidence is insufficient to support his convictions because of certain inconsistencies in the evidence. He points out, among other things, that while Sally testified that one of the drinks Baugus served her had a "haze in it," she told the SANE nurse that the drink was "fizzing"; that while she testified that Baugus's penis made contact with her vagina during the assault, she told the SANE nurse that she was unsure whether Baugus's penis had made contact with her vagina, describing instead contact with her anus; that while she testified that Baugus had brought her all of the drinks on the day of the assault, he told Detective Hennard that both he and Curtis brought her drinks. We must defer to the jury's resolution of those inconsistencies, and we will not substitute our judgment for that of the jury. *See Braughton*, 569 S.W.3d at 608; *Queeman*, 520 S.W.3d at 622; *Escue v. State*, No. 12-09-00309-CR, 2010 WL 3422457, at *1 (Tex. App.—Tyler Aug. 31, 2010, pet. ref'd) (mem. op., not designated for publication) ("Where there is conflicting evidence, the factfinder's determination on such matters is generally regarded as conclusive.")

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Baugus intentionally or knowingly caused the penetration of Sally's sexual organ with his finger without her consent and that he intentionally or knowingly caused Sally's sexual organ, without her consent, to contact his sexual organ. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. Even if we would have found to the contrary if we were sitting as the factfinder, we cannot act as the "thirteenth juror," and we may not substitute our judgment for that of the jury. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (stating that a reviewing court should not act as a "thirteenth juror"); *Burgess v. State*, No. 02-19-00203-CR, 2021 WL 3556953, at *3 n.6 (Tex. App.—Fort Worth Aug. 12, 2021, no pet.) (mem. op., not designated for publication) ("[T]he factfinder alone—in this case, the jury—judges the evidence's credibility, and we may not act as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the factfinder."). We overrule Baugus's first point.

## B. Baugus's Complaint of Improper Jury Argument

In his second point, Baugus argues that the State engaged in improper jury argument. Specifically, Baugus complains about the following: (1) argument made during the State's opening that attacked Baugus's credibility; (2) argument made during the State's closing that suggested that Baugus was the type of person that enjoyed touching an unconscious woman; (3) argument made during the State's

15

closing that Baugus was "lying"; (4) questions asked by the State to Detective Hennard regarding Sally's truthfulness that allegedly bolstered her credibility and questions that allegedly bolstered Detective Hennard's credibility; (5) argument made during the State's closing that Sally was "brutally honest"; (6) argument made during the State's closing on punishment regarding the lasting effect the sexual assault had on Sally; (7) argument made during the State's closing on punishment regarding Baugus's prescription history and that he had been "doctor shopping"; and (8) argument made during the State's closing on punishment that Baugus was "the boogie man."

We must first address whether Baugus has preserved these complaints. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). These preservation requirements apply to complaints of improper jury argument. *See Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018) ("The right to a trial untainted by improper jury argument is forfeitable."); *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004) (holding that because appellant did not object to complained-of jury argument, he "failed to preserve error"). Indeed, erroneous jury argument, even if "incurably improper," is forfeited

16

unless the complaining party objects at the time of the argument and pursues the objection to an adverse ruling. *Hernandez*, 538 S.W.3d at 623.

Here, Baugus did not raise any objection at trial to the complaints he now raises in his second point. While he acknowledges that "[c]onsequently, nothing is preserved for review under this standard," he argues that our analysis should not end. Citing, among others, *Spradlin v. State*, 245 S.W.2d 251 (Tex. Crim. App. 1951), *Marx v. State*, 150 S.W.2d 1014 (Tex. Crim. App. 1941), and *Borgen v. State*, 657 S.W.2d 15 (Tex. App.—Houston [1st Dist.] 1983) (*Borgen I*), *rev'd by Borgen v. State*, 672 S.W.2d 456 (Tex. Crim. App. 1984) (*Borgen II*), Baugus suggests that we should sustain his complaints even though he did not preserve them. We disagree.

First, we find both *Spradlin* and *Marx* distinguishable because in both of those cases an objection was raised to the complained-of jury argument. *See Spradlin*, 245 S.W.2d at 253; *Marx*, 150 S.W.2d at 1017. Second, while Baugus cites *Borgen I* for the proposition that no objection to the jury argument was necessary, he fails to acknowledge that *Borgen I* was reversed by the Texas Court of Criminal Appeals in *Borgen II*.[14] *See Borgen II*, 672 S.W.2d at 460. In *Borgen II*, the court noted "the general rule that any impropriety in the prosecutorial argument is waived by a defendant's failure to make a proper and timely objection" and found that "in light of the record as a whole and without an objection," the complained-of statement did not warrant a reversal. *Id.* at 457, 460. Moreover, in subsequent opinions, the Texas Court of

---

[14]In his brief, Baugus mischaracterizes *Borgen I* as having "no pet."

17

Criminal Appeals has held that the right not to be subjected to improper jury argument is forfeitable by inaction. *See Hernandez*, 538 S.W.3d at 622; *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) ("[W]e hold a defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal.").

Baugus also suggests that "some error was preserved" because the trial court granted his pre-trial "Motion to Limit State's Jury Argument," which requested that the State be limited to the "four permissible areas of jury argument." *See Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011) (listing the four areas that "proper jury argument generally falls within"). But such a motion in limine does not preserve error. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("A motion in limine . . . is a preliminary matter and normally preserves nothing for appellate review. For error to be preserved with regard to the subject of a motion in limine, an objection must be made at the time the subject is raised during trial." (citation and emphasis omitted)); *Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd) ("It is axiomatic that motions in limine do not preserve error."). The party must object when the subject is raised at trial. *Fuller*, 253 S.W.3d at 232; *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007). Because Baugus did not object at trial to the allegedly-improper jury argument, his motion in limine preserved nothing. We thus overrule Baugus's second point.

18

## C. Baugus's Complaints of Improper Testimony

In his third point, Baugus argues that the trial court abused its discretion by admitting certain testimony over his hearsay and relevancy objections.

### 1. Standard of Review and Applicable Law

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Generally, hearsay statements are not admissible unless the statement falls within a recognized exception to the hearsay rule. *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Tex. R. Evid. 401. Relevant evidence is generally admissible, while irrelevant evidence is not. Tex. R. Evid. 402.

### 2. Baugus's Complaint Regarding a Facebook Conversation Between Sally and His Wife

#### a. The Complained-Of Testimony

Baugus complains that, despite his relevancy objection, the trial court allowed testimony of a Facebook conversation between Sally and his wife. Specifically, he complains about the following exchange during the State's questioning of Sally:

Q. Were you aware [Baugus] was married?

A. I was not.

Q. Did he ever wear a ring around you?

A. He did not.

Q. When did you first become aware he was married?

A. That day after it happened.

Q. How did you become aware of it?

A. I believe at some point my [grandmother] had gotten into contact with her and I overheard them talking.

Q. And your initial interaction with his wife, did you have -- did you interact with her?

A. Yes.

Q. How did you interact with her?

A. On Facebook.

Q. Okay. Once again, those are hearsay, right? But did you provide that entire accounting between the two of you to the police as well?

A. Yes.

Q. And so you turned that over from the get-go?

A. Yes, ma'am.

Q. In your first encounter with her, what were your feelings with regard to his wife?

A. Disgust.

Q.  On whose part?  Who were you disgusted at?

A.  Her.

[Baugus's trial counsel]:  Objection, relevance here, Your Honor. This doesn't have anything to do with the actual act itself.

THE COURT:  Overruled.

Q.  Why?

A.  She called me a whore.

Q.  Did you actually -- did you provide to her every single text message between the two of you so she could see the entire accounting of your relationship?

A.  Yes, ma'am.

Q.  And she still called you the whore?

A.  Yes, ma'am.

### b.  Baugus Did Not Preserve His Complaint Regarding the Facebook Conversation Between Sally and His Wife

We first address whether Baugus has preserved his complaint regarding Sally's testimony of the Facebook conversation she had with Baugus's wife.  As noted earlier, to preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling.  Tex. R. App. P. 33.1(a)(1); *Montelongo*, 623 S.W.3d at 822.  A party must object as soon as the basis for the objection becomes apparent.  Tex. R. Evid. 103(a)(1); *Montelongo*, 623 S.W.3d at 827. Normally, an objection must precede testimony.  *Polk v. State*, 729 S.W.2d 749, 753

21

(Tex. Crim. App. 1987). An objection made after a witness answered may suffice to preserve error if a good reason existed for not objecting earlier. *See Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995); *see also Girndt v. State*, 623 S.W.2d 930, 934–35 (Tex. Crim. App. [Panel Op.] 1981) (noting that lateness may be excused if witness answers question before attorney can object or a showing is made that counsel misunderstood the question when asked).

Here, the State asked Sally—with no objections being lodged—several questions regarding her Facebook conversation with Baugus's wife. When asked what feelings she had toward Baugus's wife, Sally answered, "Disgust." When asked who she was disgusted at, Sally responded, "Her." Only then, after Sally had answered, did Baugus object. No other objection to this line of questioning was raised. Because Sally's answer preceded Baugus's objection, and because there is no indication that a good reason existed for Baugus not objecting earlier, we hold that Baugus's objection did not preserve his complaint. *See Dinkins*, 894 S.W.2d at 355; *Wells v. State*, No. 06-17-00180-CR, 2018 WL 988412, at *4 (Tex. App.—Texarkana Feb. 21, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that appellant failed to preserve complaint relating to admissibility of testimony where appellant's objection was lodged after witness had answered complained-of question); *see also Girndt*, 623 S.W.2d at 934–35.

Moreover, even if we were to hold that Baugus's objection to the question— "On whose part? Who were you disgusted at?"—was timely, Sally had been asked

22

about her feelings regarding Baugus's wife, and she had already answered that she felt "[d]isgust." *See West v. State*, No. 05-02-01653-CR, 2003 WL 22976705, at *12 (Tex. App.—Dallas Dec. 19, 2003, pet. ref'd) (not designated for publication) ("Garcia testified twice that Lisa Deaton told her she 'needed to check out the scene.' Appellant did not object until after the second question and answer on this subject. The testimony was hearsay. However, the testimony had already been admitted without objection. Thus, any error was waived."). Thus, we hold that Baugus has not preserved his complaint regarding Sally's testimony of the Facebook conversation she had with Baugus's wife. *See* Tex. R. App. P. 33.1(a)(1); *Montelongo*, 623 S.W.3d at 822; *West*, 2003 WL 22976705, at *12. We overrule this portion of Baugus's third point.

### 3. Baugus's Complaint of an Alleged Bribe

#### a. The Complained-Of Testimony

Baugus also complains that the trial court allowed testimony of an alleged bribe made by Dyer to Sally's grandmother despite his hearsay objection. Specifically, he refers to the following exchange during the State's questioning of Sally's grandmother:

> Q. Based on the information and the conversations you had with law enforcement, did you believe [Dyer] was being cooperative with them?
>
> A. No.
>
> Q. Did he try to sway your cooperation with law enforcement?
>
> A. Yes. Yes.
>
> Q. How so?

A.  I don't remember exactly.  But . . . he called my house and left a message.  I returned the call, and he – he was talking about the case.  And he asked me if I still wanted to have my fence fixed.

[Baugus's trial counsel]:  Objection, hearsay.

THE COURT:  Overruled.

Q.  You can answer.

A.  He asked if I wanted to have – still wanted to have my fence repaired, and then he offered $10,000.  He said $10,000 to fix it.  I said we don't need $10,000.  He went on to say that [Baugus] had already spent 20 or $25,000 on this case and [Sally] needs to drop it.

### b.  Baugus Was Not Harmed by the Testimony of the Alleged Bribe

We will assume without deciding that the trial court abused its discretion by overruling Baugus's hearsay objection to the testimony of Sally's grandmother concerning the alleged bribe made by Dyer.  Therefore, we will turn to an analysis of whether Baugus suffered any harm as a result.

A trial court's erroneous admission or exclusion of evidence that merely offends the rules of evidence is nonconstitutional error governed by Rule 44.2(b). *James v. State*, 335 S.W.3d 719, 726 (Tex. App.—Fort Worth 2011, no pet.); *see* Tex. R. App. P. 44.2(b).  Rule 44.2(b) requires us to disregard any nonconstitutional error that does not affect the appellant's substantial rights.  Tex. R. App. P. 44.2(b).  A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005).  Conversely, an error does not affect a substantial right if the

24

appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021).

In determining whether an error affected an appellant's substantial rights, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence supporting the verdict, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

Here, the complained-of testimony related to Dyer's alleged offer to pay money to fix Sally's grandmother's fence. That testimony is far removed from the evidence concerning Baugus's sexual assault of Sally. Indeed, even if that testimony could be properly characterized as a bribe—and that characterization is far from certain—it is unclear how a bribe offered by Dyer (i.e., not Baugus) would impugn the evidence presented at trial regarding sexual assault. Moreover, the testimony of the alleged bribe was not emphasized by the State during either opening statements or closing argument. Thus, after examining the whole record, we have fair assurance that the error, if any, did not have a substantial and injurious effect or influence in determining

25

the jury's verdict. *See Macedo*, 629 S.W.3d at 240; *Haley*, 173 S.W.3d at 518. Accordingly, we conclude that any potential error in admitting the testimony of Sally's grandmother concerning the alleged bribe made by Dyer did not contribute to Baugus's adjudication of guilt, and any such error was harmless. *See* Tex. R. App. P. 44.2(b). We overrule this portion of Baugus's third point.

## D.  Baugus's Complaint of Ineffective Assistance of Counsel

In his fourth point, Baugus argues that he received ineffective assistance of counsel during his trial and that the trial court abused its discretion by denying his motion for new trial raising ineffective assistance.

### 1.  Standard of Review and Applicable Law

When an appellant raises the issue of ineffective assistance of counsel in a motion for new trial, we review the trial court's denial of the motion for an abuse of discretion. *State v. Herndon*, 215 S.W.3d 901, 905 n.4, 906–07 (Tex. Crim. App. 2007); *Muirhead v. State*, No. 02-20-00089-CR, 2021 WL 4472626, at *5 (Tex. App.—Fort Worth Sept. 30, 2021, pet. ref'd) (mem. op., not designated for publication); *see Burch v. State*, 541 S.W.3d 816, 820–22 (Tex. Crim. App. 2017) (explaining that appellate court must review denial-of-motion-for-new-trial complaint for ineffectiveness in light most favorable to ruling and presume trial court disbelieved evidence supporting appellant's claim). We view the evidence in the light most favorable to the trial court's ruling, and we will reverse only if no reasonable view of the record could support the trial court's finding. *Charles v. State*, 146 S.W.3d 204, 207–08 (Tex. Crim. App. 2004),

*superseded by statute on other grounds by* Tex. R. App. P. 21.8(b), *as recognized in Herndon*, 215 S.W.3d at 905 n.5; *Muirhead*, 2021 WL 4472626, at \*5.

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v.*

27

*State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

## 2. Analysis

### a. Baugus's Complaint That His Trial Counsel Failed to Adequately Communicate and Investigate the Case

Baugus argues that his trial counsel failed to adequately communicate with him and failed to investigate the case. This argument centers around two primary concerns: (1) that Baugus's trial counsel was not adequately prepared when advising Baugus on the State's plea offers and (2) that Baugus's trial counsel did not adequately prepare him for his interviews with Detective Hennard.

As to the first of these concerns, Baugus complains that his trial counsel "did not access or download any interviews with his own client, the victim, or any witness" from the TechShare Prosecutor database used by the Tarrant County District Attorney's Office to share discovery matters in this case until a few weeks before trial. To support that contention, Baugus attached three exhibits that ostensibly reflect timestamps of when his trial counsel viewed and downloaded certain files in TechShare. But we cannot glean from those exhibits the first time that Baugus's trial counsel "access[ed] or download[ed] any interviews with his own client, the victim, or any witness."[15] Indeed, we note numerous entries in those exhibits that reflect that Baugus's trial counsel viewed and downloaded files in 2017 and 2018 from TechShare

---

[15]We note that Baugus's trial counsel was present during Detective Hennard's August 25, 2017 and September 5, 2017 interviews of Baugus.

29

in Baugus's case, although it is unclear what exactly was viewed and downloaded.[16] After reviewing the record in the light most favorable to the trial court's ruling on Baugus's motion for new trial, we hold that Baugus has not proven that his trial counsel's representation was deficient with respect to counsel's preparation when advising Baugus on the State's plea offers. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Dryer v. State*, No. 01-22-00201-CR, 2023 WL 2919802, at *8 (Tex. App.— Houston [1st Dist.] Apr. 13, 2023, no pet. h.) ("Nor can we infer that counsel's performance was deficient based on portions of the record that are unclear.").

Moreover, even if we assume that Baugus's trial counsel was deficient in this respect, we cannot conclude that this failure prejudiced Baugus's defense. To establish prejudice in a claim of ineffective assistance of counsel in which a defendant is not made aware of a plea-bargain offer or rejects a plea-bargain offer because of bad legal advice, the defendant must show a reasonable probability that (1) he would have accepted the offer if counsel had not given ineffective assistance, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would not have refused to accept the plea bargain. *Ex parte Argent*, 393 S.W.3d 781, 784 (Tex. Crim. App. 2013). Baugus has not established any of these factors; thus, even if his trial counsel was deficient by not being adequately prepared when advising Baugus on the State's plea offers, Baugus has not shown prejudice. *See id.*

[16]At the hearing on the motion for new trial, Baugus's trial counsel testified that once he downloaded a file from TechShare, it was in his own computer filing system, and he did not need to use TechShare anymore to access the file.

We now turn to Baugus's argument that his trial counsel did not adequately prepare him for his interviews with Detective Hennard. To support that argument, Baugus points to his testimony from the hearing on his motion for new trial where he stated that his trial counsel did not give him any advice or warnings before the interviews with Detective Hennard. Baugus's trial counsel testified at his deposition, however, that he had spoken with Baugus prior to those interviews "[i]n great detail" about the advantages and disadvantages of speaking with Detective Hennard. When pressed on what he meant by "great detail," he stated,

> We start with the facts, what we know, what my client has told me, what the detective has told me, everything that he knew about the – the victim, or the IP in this case, that my – my client knew. Previous relationship, this, that, and the other.
>
> And I said, "Look. If you talk to the detective, and you tell the detective X – and I'm going to be there with you. You tell the detective what we have agreed on, I don't think we're going to have any problems with it. I think it will make things easier in the long run."
>
> . . . .
>
> I said, "Of course, we have to be very clear on what we tell the detective." And we spent a great deal of time working on it because what you say can be used against you.[17]

After reviewing the record in the light most favorable to the trial court's ruling on Baugus's motion for new trial, we hold that Baugus has not proven that his trial

_____

[17]Baugus's trial counsel also testified that prior to Baugus's second interview with Detective Hennard, he told Baugus, "If the detective's got questions, irregularities, this, that, and the other, that's what this is about. He's going to ask you about those, and in an effort to clear – clear up his irregularities he's got."

31

counsel's representation was deficient with respect to his preparation of Baugus before the interviews with Detective Hennard. *See Burch*, 541 S.W.3d at 820–22; *Charles*, 146 S.W.3d at 207–08; *Acosta v. State*, No. 14-09-00638-CR, 2011 WL 2150233, at *7 (Tex. App.—Houston [14th Dist.] June 2, 2011, no pet.) (mem. op., not designated for publication) (holding that trial court could have reasonably concluded that attorney had adequately prepared appellant for prosecutor's cross-examination where attorney testified that he had "met with appellant numerous times prior to trial").

### b. Baugus's Complaint That His Trial Counsel Failed to Effectively Cross Examine Sally and Sally's Grandmother

Baugus next argues that his trial counsel failed to effectively cross examine Sally and Sally's grandmother. The crux of Baugus's argument is that he thought that Sally and her grandmother had minimized their relationship with Dyer. In this regard, Sally testified that she did not have a lot of contact with Dyer, while Sally's grandmother testified that her own relationship with Dyer was "[n]onexistent." According to Baugus, his trial counsel could have called Dyer as a witness to testify that Sally and Sally's grandmother "were being deceptive concerning the relationship between [Sally] and [Dyer]"—suggesting that Sally and Dyer had some sort of a personal relationship.

But the record reveals that Baugus's trial counsel had strategic reasons for not calling Dyer as a witness. Baugus's trial counsel described Dyer as a "loose cannon" and explained that the more he talked to Dyer, "the more problematic [he] found

32

whatever [Dyer] said to be." He also testified that Dyer "had the potential of being a very damaging witness instead of a helpful witness," noting his concern about Dyer's alleged bribe of Sally's grandmother and explaining that he wanted to "downplay" and not "amplify" that allegation. Thus, after reviewing the record in the light most favorable to the trial court's ruling on Baugus's motion for new trial, we hold that Baugus has not proven that his trial counsel's representation was deficient with respect to not calling Dyer as a witness. *See Ex parte Woods*, 176 S.W.3d 224, 227 (Tex. Crim. App. 2005) ("It was not a deficient strategy for applicant's attorneys to decline to call witnesses who would testify to some mitigating facts, but then be subject to cross-examination concerning a vast array of aggravating facts."); *Grundy v. State*, No. 05-90-00832-CR, 1991 WL 134592, at *8 (Tex. App.—Dallas July 23, 1991, pet. ref'd) (not designated for publication) (recognizing several reasons why counsel's decision not to call defendant's mother or other punishment-phase witnesses could fall into the category of trial strategy and thus not constitute deficient performance).

Baugus also briefly mentions that his trial counsel failed to call Curtis as a witness. Baugus suggests—without citing anything in the record to support it—that Curtis "could have provided the jury with an alternative theory of why [Sally] had benzodiazepine in her system." The "failure to call witnesses at the guilt[–]innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983). Here, Baugus has not established that he would have

33

benefitted from Curtis's testimony, and we do not see a reasonable probability that his testimony would have changed the result of Baugus's trial. *See Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) ("Here, we are not convinced that Appellant would have benefitted from Padilla's testimony, and we do not see a reasonable probability that her testimony would have changed the result of Appellant's trial."). Thus, after reviewing the record in the light most favorable to the trial court's ruling on Baugus's motion for new trial, we hold that Baugus has not proven that his trial counsel's representation was deficient with respect to not calling Curtis as a witness, nor has Baugus proven that such a deficiency prejudiced his defense. *See Perez*, 310 S.W.3d at 894; *King*, 649 S.W.2d at 44.

### c. Baugus's Complaint That His Trial Counsel Failed to Object to the State's Jury Argument

Baugus next complains that his trial counsel failed to object to certain arguments made by the State to the jury.[18] But Baugus does not point to anything in

---

[18]As noted in our discussion of Baugus's second point, he complains that his counsel failed to object to the following: (1) argument made during the State's opening that attacked his credibility; (2) argument made during the State's closing that suggested that he was the type of person that enjoyed touching an unconscious woman; (3) argument made during the State's closing that he was "lying"; (4) questions asked by the State to Detective Hennard regarding Sally's truthfulness that allegedly bolstered her credibility and questions that allegedly bolstered Detective Hennard's credibility; (5) argument made during the State's closing that Sally was "brutally honest"; (6) argument made during the State's closing on punishment regarding the lasting effect the sexual assault had on Sally; (7) argument made during the State's closing on punishment regarding Baugus's prescription history and that he had been "doctor shopping"; and (8) argument made during the State's closing on punishment that Baugus was "the boogie man."

the record indicating why his trial counsel failed to make such objections. Absent such a showing, we cannot say that Baugus's trial counsel's performance was deficient. *See Menefield*, 363 S.W.3d at 593 ("Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.") (quotation omitted); *Panchol v. State*, No. 02-12-00228-CR, 2013 WL 3874763, at *9 (Tex. App.—Fort Worth July 25, 2013, pet. ref'd) (mem. op., not designated for publication) ("The record is absolutely silent regarding counsel's reasons for not objecting to [complained-of jury argument made by the State during closing]. . . . That being the case, Appellant has failed to show by a preponderance of the evidence that counsel was deficient."); *Moreno v. State*, No. 03-07-00713-CR, 2010 WL 2698510, at *10 (Tex. App.—Austin July 8, 2010, pet. ref'd) (mem. op., not designated for publication) (holding that because "[t]he record is silent as to the reasoning and strategy behind the trial counsel's inaction in not making objections" to the State's jury argument during the punishment phase of appellant's trial, appellant "has not demonstrated in the record that trial counsel rendered ineffective assistance"). Thus, after reviewing the record in the light most favorable to the trial court's ruling on Baugus's motion for new trial, we hold that Baugus has not proven that his trial counsel's representation was deficient with respect to counsel's failure to object to the State's jury argument. *See Menefield*, 363 S.W.3d at 593; *Panchol*, 2013 WL 3874763, at *9; *Moreno*, 2010 WL 2698510, at *10.

### d. Baugus's Complaint That His Trial Counsel Failed to Object to Damaging Photographic Evidence

Baugus next complains that his trial counsel failed to object to five photographs admitted at trial that depicted Sally's clothing and car the day after the assault and that showed some blood on Sally's clothing. Baugus complains that the evidence at trial reflected that the blood was due to Sally's menstrual cycle and was not related to the sexual assault and that the admission of the photographs inflamed the jury against him. Once again, however, Baugus does not point to anything in the record indicating why his trial counsel failed to object to the photographs.[19] Absent such a showing, we cannot say that his trial counsel's performance was deficient. *See Menefield*, 363 S.W.3d at 593; *Mata*, 226 S.W.3d at 432; *Andrus v. State*, No. 01-08-00738-CR, 2009 WL 4856202, at *9 (Tex. App.—Houston [1st Dist.] Dec. 17, 2009, no pet.) (mem. op., not designated for publication) ("Because there is no evidence in the record that affirmatively demonstrates that trial counsel's failure to object to the photographs was deficient, we must heed the strong presumption that trial counsel provided reasonable professional assistance."). Thus, after reviewing the record in the light most favorable to the trial court's ruling on Baugus's motion for new trial, we hold that Baugus has not proven that his trial counsel's representation was deficient with respect to counsel's failure to object to the complained-of photographs. *See*

---

[19]While Baugus's trial counsel was asked at his deposition and the hearing on the motion for new trial about several aspects of his trial performance, he was not asked about his failure to object to the complained-of photographs.

*Menefield*, 363 S.W.3d at 593; *Mata*, 226 S.W.3d at 432; *Andrus*, 2009 WL 4856202, at *9.

### e. Baugus's Complaint That His Trial Counsel Failed to Investigate Witnesses Called During the Punishment Phase of His Trial

Baugus next complains that his trial counsel failed to investigate witnesses called during the punishment phase of his trial. Baugus's argument centers around the fact that his trial counsel called Scott Schroeder and John Cooper to testify during the punishment phase of his trial, and Baugus contends that their respective testimony was damaging.

Schroeder was a Community Supervision and Corrections Department (CSCD) officer assigned to Tarrant County Criminal District Court No. 3. At the punishment phase of Baugus's trial, Schroeder testified at length about the conditions of probation in Tarrant County. On cross examination, Schroeder testified about "chronos" kept by the CSCD on Baugus, which Schroeder explained were contacts that CSCD had with individuals who were on bond or probation. *See Norman v. State*, No. 13-10-00017-CR, 2011 WL 2732673, at *1 n.1 (Tex. App.—Corpus Christ–Edinburg July 14, 2011, no pet.) (mem. op., not designated for publication) ("The term 'chronos' refers to the chronology of events set out in the records from the probation department. Chronos include each and every office contact, field contact, and collateral contact with the probationer."). Schroeder testified that those "chronos"

37

revealed past charges brought against Baugus for drug possession[20] and that Baugus had tested positive for benzodiazepines while on bond.[21] According to Baugus, calling Schroeder as a witness "came with excessively prejudicial baggage concerning [Baugus's] medical history and the history of his chronos."

As to strategy, Baugus's trial counsel testified that it was "routine procedure to have the court officer testify as to what the -- probationer or supervision records are, what they say."[22] Counsel also said, "I know from experience and from doing this that the judge is going to allow a supervising officer, you know, like a court officer, is going to allow that testimony as to the chronos. . . . I elected to go with the testimony of the person that was available."

After reviewing the record in the light most favorable to the trial court's ruling on Baugus's motion for new trial, we hold that Baugus has not proven that his trial counsel's representation was deficient with respect to calling Schroeder as a witness during the punishment phase of his trial because there was a reasonable, strategic reason for that decision—namely, the introduction of testimony regarding the

---

[20]Schroeder testified that on July 29, 2008, Baugus had pled guilty to a charge of possession of marijuana and that he was placed on a "six-month deferred adjudication probation" relating to that charge.

[21]The State also asked whether CSCD would know "that [Baugus] had 15 different doctors prescribing him 71 prescriptions since 2018," and Schroeder answered, "No."

[22]Baugus's trial counsel also testified that while Schroeder was assigned to Criminal District Court No. 3, he was acting as the court officer for the 396th District Court on the day of his testimony.

probation process and because the trial court routinely allowed testimony from a supervising officer. *See Prine v. State*, 537 S.W.3d 113, 118 (Tex. Crim. App. 2017) ("[T]he decision to call [the probation officer] as a witness was a strategic choice that involved weighing the risks and benefits of his testimony. . . . [T]his record does not support a conclusion that the attorney's choice to put him on the stand was so outrageous that no other attorney would have done the same.").

Moreover, even if we assume that Baugus's trial counsel was deficient in this respect, we cannot conclude that this failure prejudiced Baugus's defense. In this regard, three jurors testified at the hearing on Baugus's motion for new trial. The jurors were each asked whether Baugus's sentence would have changed if Baugus had provided better evidence at punishment: one juror stated, "No, I don't"; another stated, "No, ma'am"; and the other juror stated, "I don't think so." Thus, even if Baugus's trial counsel was deficient by calling Schroeder as a witness during the punishment phase of Baugus's trial, Baugus has not shown prejudice. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308; *see also Johnson v. State*, 233 S.W.3d 109, 117 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that merely showing that counsel's deficient conduct had some conceivable effect on the proceedings was inadequate proof of prejudice for purposes of establishing ineffective assistance of counsel).

With respect to Cooper, the record reflects that Cooper was a friend of the Baugus family who testified in support of Baugus at the punishment phase of

Baugus's trial. Baugus argues that Cooper was a poor choice of a witness, noting that Cooper could recall very little about Baugus's children when asked about them at trial. Baugus complains that Cooper was "hastily" chosen by his trial counsel "about ten minutes prior to the commencement of the punishment hearing to the jury." Baugus's trial counsel explained that he called Cooper as a witness because the Baugus family "seemed intent that [Cooper] . . . should testify because he knew the family." After reviewing the record in the light most favorable to the trial court's ruling on Baugus's motion for new trial, we hold that Baugus has not proven that his trial counsel's representation was deficient with respect to calling Cooper as a witness during the punishment phase of his trial because there was a reasonable, strategic reason for that decision—namely because members of Baugus's family wanted Cooper to testify because "he knew the family." *See Prine*, 537 S.W.3d at 118; *Sabins v. State*, No. 03-18-00732-CR, 2020 WL 3495859, at *8 (Tex. App.—Austin June 25, 2020, no pet.) (mem. op., not designated for publication) ("[T]he decision to call a witness is generally a matter of trial strategy.").

Moreover, even if we assume that Baugus's trial counsel was deficient in this respect, we cannot conclude that this failure prejudiced Baugus's defense. While two of the jurors who testified at the hearing on Baugus's motion for new trial noted that Cooper seemed to not know Baugus well, none of the jurors indicated that Cooper's testimony had any impact on their sentencing decisions. To the contrary, one juror was asked whether Cooper's testimony had any influence on the juror's decision to

sentence Baugus, and the juror responded, "No, not at all." Moreover, as noted above, each of the jurors were asked whether Baugus's sentence would have changed if Baugus had provided better evidence at punishment, and the responses were, "No, I don't"; "No, ma'am"; and "I don't think so." Thus, even if Baugus's trial counsel was deficient by calling Cooper as a witness during the punishment phase of Baugus's trial, Baugus has not shown prejudice. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308; *Johnson*, 233 S.W.3d at 117.

### f. Baugus's Complaint That the Cumulative Effect of His Trial Counsel's Errors Caused Him Substantial Harm

Finally, Baugus complains that the cumulative effect of his trial counsel's errors caused him substantial harm and led to his wrongful conviction, or, at a minimum, led to the imposition of a wrongful sentence. But, as we have already explained, Baugus's counsel was not deficient, or even if he was deficient in certain respects, Baugus has not demonstrated that he suffered prejudice. Thus, Baugus's cumulative-error complaint lacks merit because there is no error to cumulate. *See Bell v. State*, No. 02-18-00244-CR, 2019 WL 1967538, at *9 (Tex. App.—Fort Worth May 2, 2019, pet. ref'd) (mem. op., not designated for publication) ("Bell argues that even if each of his previous points do not constitute harm sufficient for reversal, their cumulative effect does . . .. But his individual points either do not demonstrate reversible error or do not show that he was harmed. Therefore, there is no error to cumulate."); *Baker v. State*, No. 03-18-00240-CR, 2019 WL 1646260, at *7 (Tex. App.—Austin Apr. 17,

41

2019, no pet.) (mem. op., not designated for publication) ("Here, Baker's cumulative-error contention lacks merit because we have concluded . . . that one complained-of error was harmless and that there was no error as to the remaining complaints."). We overrule Baugus's fourth point.

## IV. CONCLUSION

Having overruled Baugus's four points, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 11, 2023